<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 15-1219 (and consolidated cases)
_____

UTILITY SOLID WASTE ACTIVITIES GROUP, *et al.*,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent.*
_____

Petition for Review of Final Administrative Actions of the
United States Environmental Protection Agency
_____

**PROOF REPLY BRIEF OF ENVIRONMENTAL PETITIONERS**
_____

Mary M. Whittle
Earthjustice
3904 Bonnell Drive
Austin, TX 78731
(512) 537-2791
mwhittle@earthjustice.org

Lisa Evans
Earthjustice
21 Ocean Avenue
Marblehead, MA 01945
(781) 631-4119
levans@earthjustice.org

Matthew E. Gerhart
Earthjustice
633 17th St., Suite 1600
Denver, CO 80202
(303) 623-9466
mgerhart@earthjustice.org

*Counsel for Environmental Petitioners
Clean Water Action, Environmental
Integrity Project, Hoosier
Environmental Council,
PennEnvironment, Prairie Rivers
Network, Sierra Club, Tennessee Clean
Water Network, and Waterkeeper
Alliance*

**Dated:  July 14, 2016**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY OF ABBREVIATIONS ...................................................... v

STATUTES AND REGULATIONS ......................................................... 1

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ....................................................................................... 2

I.  EPA'S CLASSIFICATION OF UNLINED IMPOUNDMENTS AS
    SANITARY LANDFILLS VIOLATES RCRA ............................................ 2

    A.  EPA's Prediction that More than One Third of All Unlined
        Impoundments Will Contaminate Groundwater with Arsenic
        Above Drinking Water Standards Qualifies as a Reasonable
        Probability of Adverse Effects. ............................................... 3

    B.  EPA Fails to Justify Its Disparate Treatment of Existing and
        New Unlined Surface Impoundments. ....................................... 6

    C.  EPA's Response Ignores the Reality that Cleanup Is Not
        Always Possible. ................................................................... 7

    D.  EPA's Presumption of Compliance with the Monitoring and
        Corrective Action Requirements of the Rule Is Contrary to the
        Record .................................................................................. 9

II. IMPOUNDMENTS POSING TWICE THE RISK OF CANCER
    THAT EPA FINDS ACCEPTABLE PRESENT A REASONABLE
    PROBABILITY OF ADVERSE EFFECTS TO HEALTH. ......................... 11

    A.  EPA Improperly Discounts Its Own Data Regarding the
        Necessity of Composite Liners. .............................................. 12

    B.  EPA Fails to Justify Disparate Treatment of New and Existing
        Surface Impoundments with Respect to Liners. ......................... 14

III.    EPA'S EXEMPTION OF INACTIVE IMPOUNDMENTS AT
        FACILITIES THAT NO LONGER GENERATE ELECTRICITY
        FROM REGULATION IS ARBITRARY AND CAPRICIOUS..................17

IV.    EPA FAILS TO JUSTIFY ITS PROVISIONS ALLOWING FOR
        LATE NOTICE, WHICH DO NOT ENSURE NO REASONABLE
        PROBABILITY OF ADVERSE EFFECTS. .................................................24

CONCLUSION AND RELIEF REQUESTED .......................................................25

CERTIFICATE OF COMPLIANCE.......................................................................28

CERTIFICATE OF SERVICE ...............................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*\* Cnty. of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999)................................................................6, 13, 19

*Gen. Chem. Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987).........................................................................7

*Michigan v. EPA*,
  135 S.Ct. 2699 (2015)....................................................................................15

*\* Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..............................................................9, 14, 15, 19, 20, 22

*B.F. Goodrich Co. v. Murtha*,
  958 F.2d 1192 (2d Cir. 1992) .........................................................................2

*\* Transactive Corp. v. United States*,
  91 F.3d 232 (D.C. Cir. 1996)...........................................................7, 14, 16, 19

**Statutes**

*\* 42 U.S.C. § 6944(a) ................................... 1, 3, 4, 8, 11, 13, 14, 16, 17, 23, 25, 26

42 U.S.C. § 6973 ...........................................................................................22, 23

42 U.S.C. § 6974 ...........................................................................................25, 26

**Regulations**

40 C.F.R. § 257.50 ...............................................................................................26

40 C.F.R. § 257.71 ..........................................................................................5, 11, 15, 26

40 C.F.R. § 257.72 ...............................................................................................14

40 C.F.R. § 257.96 ...............................................................................................12

40 C.F.R. § 257.101 .............................................................................................12

*Authorities upon which we chiefly rely are marked with asterisks (\*).*

**Other Authorities**

* Disposal of Coal Combustion Residuals from Electric Utilities,
    80 Fed. Reg. 21,302 (Apr. 17, 2015)........... 2, 3, 6, 7, 8, 9, 11, 15, 16, 18, 22, 23

EPA, National Electric Energy Data System (NEEDS) v.5.13 (last
    updated Sept. 25, 2015),
    https://www.epa.gov/airmarkets/documentation-national-electric-
    energy-data-system-needs-v513 ........................................................................18

Hazardous and Solid Waste Management System; Identification and
    Listing of Special Wastes; Disposal of Coal Combustion Residuals
    From Electric Utilities, 75 Fed. Reg. 35,128 (June 21, 2010)...............20, 24, 25

Hazardous Waste Guidelines and Regulations,
    43 Fed. Reg. 58,946 (Dec. 18, 1978)..........................................................19, 20

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CCR | Coal combustion residuals |
| CCR Damage Case Database | Alexander Livnat, EPA, CCR Damage Case Database, EPA-HQ-RCRA-2009-0640-12123 (Dec. 18, 2014) |
| Damage Case Compendium | Alexander Livnat, EPA, Damage Case Compendium (Dec. 18, 2014) [3 volumes split across 5 files, EPA-HQ-RCRA-2009-0640-12118–12122] |
| Envtl. Intervenor Br. | Brief of Environmental Intervenor-Respondents (May 18, 2016) |
| Envtl. Pet. Br. | Brief of Environmental Petitioners (Dec. 18, 2015) |
| EPA | United States Environmental Protection Agency |
| EPA Br. | Brief of Respondent EPA (Apr. 18, 2016) |
| Indus. Intervenor Br. | Brief of Industry Intervenor-Respondents (May 18, 2016) |
| JA | Joint Appendix |
| RA | EPA, Human and Ecological Risk Assessment of Coal Combustion Residuals, EPA-HQ-RCRA-2009-0640-11993 (Dec. 2014) |
| RCRA | Resource Conservation and Recovery Act |
| Response to Comments | EPA, Comment Summary and Response Documents, Docket EPA-HQ-RCRA-2009-0640 (Dec. 2014) [17 volumes: EPA-HQ-RCRA-2009-0640-12124–12140] |
| RIA | EPA, Regulatory Impact Analysis for EPA's 2015 RCRA Final Rule Regulating Coal Combustion Residual (CCR) Landfills and Surface Impoundments At Coal-Fired Electric Utility Power Plants, EPA-HQ-RCRA-2009-0640-12034 (Dec. 2014). |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the addendum to the Environmental Petitioners' opening brief.

## SUMMARY OF ARGUMENT

The United States Environmental Protection Agency ("EPA") failed to justify provisions of its final rule governing the disposal of coal combustion residuals ("CCR" or "coal ash") from electric utilities that allow the dangerous practice of storing immense quantities of toxic waste in unlined impoundments to continue, authorize existing disposal units to use ineffective liners, unlawfully exempt from regulation inactive impoundments at power plants that no longer generate electricity, and fail to provide citizens with the tools needed to enforce the rule's requirements. EPA violated its obligation under the Resource Conservation and Recovery Act ("RCRA") to ensure "no reasonable probability of adverse effects on health or the environment," 42 U.S.C. § 6944(a), and otherwise acted arbitrarily and capriciously in enacting these challenged provisions. For the reasons below, Environmental Petitioners request that this Court remand, and vacate as appropriate, the challenged provisions.

1

**ARGUMENT**

**I.    EPA'S CLASSIFICATION OF UNLINED IMPOUNDMENTS AS SANITARY LANDFILLS VIOLATES RCRA.**

Rather than phasing out the disposal method that EPA itself found poses the "greatest risks,"[1] EPA claims it has discretion under RCRA to allow disposal in unlined surface impoundments until these units "*actually* leak" toxic chemicals such as lead, mercury, and arsenic into the environment.  EPA Br. at 84 n.16.  EPA asserts that this complies with the statute's "no reasonable probability of adverse effects" mandate, even though EPA's own analysis found that more than 36 percent of unlined impoundments will leak toxic chemicals and contaminate groundwater, unlined impoundments are more prone to catastrophic failures, it is not always possible to clean up contaminated groundwater, and even where it is possible to clean up the contamination, a majority of facilities will not comply with the clean-up requirements.  EPA's arguments have no merit, and its position flies in the face of the very nature and purpose of RCRA: to prevent harms before they occur.  *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1202 (2d Cir. 1992) ("RCRA is preventative.").

---

[1] Disposal of Coal Combustion Residuals from Electric Utilities, 80 Fed. Reg. 21,302, 21,452 (Apr. 17, 2015), JA___.

**A.     EPA's Prediction that More than One Third of All Unlined Impoundments Will Contaminate Groundwater with Arsenic Above Drinking Water Standards Qualifies as a Reasonable Probability of Adverse Effects.**

The record is replete with evidence of unlined impoundments leaking and contaminating groundwater, as "damage cases were primarily associated with unlined units."  80 Fed. Reg. at 21,452, JA___; *see also* EPA-HQ-RCRA-2009-0640-12118 ("Damage Case Compendium"), Vol. I at 11-16, 64-67, 91-104, 129-30, 185-89, 207, JA___.  But EPA and Industry argue that EPA need not require existing unlined impoundments to close or install a composite liner because only "36.2% of unlined surface impoundments will contaminate groundwater at some point in the future."  Indus. Intervenor Br. at 7; *see also* EPA Br. at 88; RIA at 5-22, JA___.  EPA's Risk Assessment, however, predicts that such contamination will endanger human health. RA at 5-5, JA____.  A single leaking impoundment can sicken a neighborhood, Damage Case Compendium, Vol. I at 51-63, JA____, or destroy a community in a catastrophic structural collapse, *id*. at 140-54, JA___.  EPA's regulations allowing toxic chemicals from hundreds of impoundments to leak into groundwater and surface water violate RCRA.  *See* 42 U.S.C. § 6944(a).

When weighing the probability of adverse effects on health and the environment caused by leaking impoundments, it is important to understand that "leak" is a term of art.  Virtually *all* unlined impoundments will "leak" in the common sense of the word, because impounded water will infiltrate through

3

impounded ash into the underlying soil or groundwater, carrying contamination with it.[2] By contrast, EPA's Regulatory Impact Analysis ("RIA") defines "leak" as a "groundwater contamination event." RIA at 5-22 n.275, JA___. For purposes of calculating the 36.2 percent risk of groundwater contamination from unlined impoundments (RIA at 5-22, Ex. 5-I, JA___), such an event means an exceedance of the drinking water standard for arsenic within one mile of an impoundment. RIA at 5-22 n.275, JA___.

However, the likelihood of groundwater contamination varies depending on how it is measured. For example, in another section of the RIA, EPA defines a "groundwater contamination event" as an exceedance of the drinking water standard for arsenic within one *meter* of an unlined impoundment and concludes that the risk of such an event during the lifetime of an impoundment is 57 percent. RIA at 4-9, 5-22 n.275, JA___. Therefore, while the 36.2 percent figure may capture the risk of an unlined impoundment "leaking" as defined by an exceedance of the drinking water standard for arsenic within one mile, the risk of contamination occurring according to other benchmarks is much greater. Nonetheless, under any plain language reading of 42 U.S.C. § 6944(a), EPA's prediction that more than one third of all unlined impoundments will contaminate

---

[2] The EPA Risk Assessment describes this dynamic with an "infiltration rate," which varies by liner type. RA at 4-8, JA___.

groundwater with arsenic above drinking water standards qualifies as a "reasonable probability of adverse effects on human health and the environment."

The number of impoundments implicated is significant: based on EPA's identification of at least 575 unlined impoundments, RIA at 3-4 n.105, JA____; RA at 5-5, Table 5-3, JA____, there is a reasonable probability that 208 impoundments will contaminate groundwater with the toxic constituents of coal ash.[3] Industry Intervenors claim that the 36.2 percent of unlined impoundments EPA predicts will contaminate groundwater with arsenic above drinking water standards overestimates the threat because EPA considers an impoundment with two synthetic liners (but no underlying impermeable barrier) to be an "unlined" impoundment under the rule, but Industry is incorrect. Indus. Intervenor Br. at 8; *see also* 40 C.F.R. § 257.71(a)(3). EPA characterized these impoundments as "composite-lined for the purposes of the risk assessment" and, therefore, these units were never part of the 36.2 percent. RA at 5-4, JA___.

Regardless, the fact that some unlined impoundments will not cause groundwater contamination events does not excuse EPA from its duty to protect the public from the risks posed by hundreds of impoundments that will. As EPA recognizes with respect to its requirement that new impoundments have liners,

---

[3] EPA's Risk Assessment reports a total of 952 surface impoundments. RA at 5-4, Table 5-2, JA ___. By this count, 619 impoundments would be unlined, and 224 impoundments would be expected to leak.

"[b]oth the CCR damage case history and the risk assessment clearly show the need for and the effectiveness of liners in reducing the potential for groundwater contamination at CCR landfills and CCR surface impoundments."[4]  80 Fed. Reg. at 21,371, JA___.

## B.    EPA Fails to Justify Its Disparate Treatment of Existing and New Unlined Surface Impoundments.

EPA's record lacks any rational explanation for allowing hundreds of existing impoundments to continue operating without liners but prohibiting new impoundments from being built without liners.  *See* Envtl. Pet. Br. at 26-27.  EPA asserts that it has discretion to do so, EPA Br. at 84-85, but "[a]s broad as [its] discretion is, it is not a license to ... treat like cases differently."  *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (internal citations omitted).  "A long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar

---

[4] Furthermore, releases of toxic metals to groundwater from unlined impoundments can flow to surface water, which can result in the contamination of surface water and harm to aquatic life.  Earthjustice et al. Comments, App. H, EPA-RCRA-2009-0640-6313, JA___.  When discharged to surface water, contaminants such as arsenic and selenium can be stored deep in water bodies and in sediment.  *Id.*; 80 Fed. Reg. at 21,363, JA___.  Consequently, contamination has long-lasting adverse effects on aquatic life.  The harm can be particularly severe because arsenic and selenium are toxic to aquatic life at low doses and bioaccumulate in aquatic organisms, thus greatly magnifying the risk.  Earthjustice et al. Comments, EPA-RCRA-2009-0640-6315 at 169-70, JA___.

situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

In the preamble to the final rule, EPA states that RCRA "subtitle D does not explicitly authorize EPA to establish different standards for existing and new units." 80 Fed. Reg. at 21,361, JA___. EPA then proceeds to do precisely what it said it cannot do without a risk-based justification: prohibit new impoundments from operating without a composite liner, but allow existing impoundments without any liner whatsoever to continue operating. EPA does so without any evidence that existing unlined impoundments are any less dangerous than new unlined impoundments with respect to the health and environmental risks. EPA has not, and indeed cannot, offer any rational basis for its disparate treatment of new and existing impoundments. Thus, EPA's action is arbitrary and capricious because it is "internally inconsistent and inadequately explained." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987).

## C. EPA's Response Ignores the Reality that Cleanup Is Not Always Possible.

EPA assumes that groundwater and surface water contamination can always be remediated to a level where harms to human health and the environment no longer exist. *See* EPA Br. at 83 (discussing "corrective action to remedy contamination"). But unlined impoundments leak more quickly, and leak larger volumes of toxic coal ash-contaminated water, than lined impoundments. 80 Fed.

Reg. at 21,370, JA_____.  Once unlined impoundments leak, it is simply not

possible to clean up the contamination in some circumstances, and harmful levels

of contamination will remain.  *See* Response to Comments, Vol. 9 at 50, JA____

("[R]estoring aquifer or surface water to background conditions predating the

disposal of CCRs would be ideal.  However, that will not always be possible.").

Rather than respond to this argument, EPA ignores it and incorrectly states

that Environmental Petitioners have not contested the adequacy of the groundwater

monitoring and corrective action requirements.  EPA Br. at 85-86.  Environmental

Petitioners challenged the adequacy of the monitoring and corrective action

requirements not only in their comments on the proposed rule, Earthjustice et al.

Comments, App. M and O, EPA-RCRA-2009-0640-6313, JA____, but also in their

opening brief.  Envtl. Pet. Br. at 24-25.  To allow existing, unlined impoundments

to continue operating poses a reasonable probability of harm to health and the

environment.  Monitoring and corrective action will not be sufficient to meet the

standard in 42 U.S.C. § 6944(a) given the documented risks presented by unlined

impoundments, including catastrophic failure[5] and the reality that cleanup is not

always possible.

_____

[5] Uncontrolled leaking ponds can fail.  Composite liners help constrain leaks to a
limited area and slower release.  80 Fed. Reg. at 21,370, JA_____.  Saturated soil
can cause the collapse of impoundment dikes.  Damage Case Compendium, Vol. I
at 143, JA___.  Without a composite liner, an underlying structural failure like the
broken pipe under the Dan River impoundment can cause a massive release, such

**D.     EPA's Presumption of Compliance with the Monitoring and Corrective Action Requirements of the Rule Is Contrary to the Record.**

EPA's position that after-the-fact remediation of groundwater contamination from leaking unlined impoundments is sufficient to avoid a reasonable probability of adverse effects, EPA Br. at 82-86, is arbitrary and capricious because it ignores data in the record anticipating noncompliance with the rule.  An agency's decision is arbitrary and capricious where its "explanation for its decision [] runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n of U.S.  v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Here, EPA assumes that states and utilities will comply with the monitoring and remediation provisions of the rule, an assumption which is unsupported by the record.  Envtl. Pet. Br. at 25.  In fact, EPA itself predicted that, under a subtitle D rule, more than half of the country's coal ash waste would be disposed of at facilities that fail to comply with the rule. Regulatory Impact Analysis for EPA's Proposed RCRA Regulation of Coal Combustion Residues Generated by the Electric Utility Industry, EPA-HQ-RCRA-2009-0640-0003 at 198-99, JA___.

---

as the 39,000 tons of coal ash and 27 million gallons of wastewater that spilled into the Dan River.  *Id.* at 79-80, JA___.  Unlined impoundments pose significantly greater risks of catastrophic failure, and EPA failed to explain how groundwater monitoring will prevent disastrous failures such as the Kingston and Dan River spills.

EPA now attempts to dismiss the reality of noncompliance as merely a "hypothetical scenario of inadequate enforcement [that] might arise in given instances." EPA Br. at 83. EPA cannot discount its own findings because they now prove inconvenient. Indeed, EPA's contention that the monitoring and corrective action requirements for existing unlined impoundments will be effective only "when properly applied," EPA Br. at 84, underscores the fact that, absent proper application – which EPA's own data show will be lacking 52 percent of the time, EPA-HQ-RCRA-2009-0640-0003 at 198-99, JA____ – those requirements will not be effective and will not ensure against a reasonable probability of harm.

EPA punts the issue by arguing that, because it lacks legal authority to enforce the requirements under subtitle D and must instead rely upon states and citizens for enforcement, widespread noncompliance with the rule is a complaint to take to Congress. EPA Br. at 83-84. However, the problem is not the statute. The problem is that EPA ignored the evidence in the record, chose the very regulatory option for which it predicted high levels of noncompliance, and further chose not to phase out unlined impoundments.

In sum, neither Industry nor EPA disputes the evidence in the record that: at least 36.2 percent of unlined impoundments will leak and contaminate groundwater, RIA at 5-22, JA___; unlined units are more likely to suffer a catastrophic collapse, 80 Fed. Reg. at 21,370, JA___; Damage Case Compendium,

10

Vol. I at 143, JA___; when unlined impoundments leak, it will not always be possible to restore groundwater and surface water to uncontaminated conditions, Response to Comments, Volume 9 at 50, JA___; and, even where remediation is possible, 52 percent of coal ash (approximately 57,200,000 tons each year[6]) will be disposed of at sites that do not comply with the rule, EPA-HQ-RCRA-2009-0640-0003 at 198-99, JA___.   In light of these undisputed facts, EPA properly concludes that RCRA requires the prohibition of new unlined impoundments but inexplicably reaches a different conclusion for existing unlined impoundments— allowing their continued operation.  Given the evidence in the record, EPA's decision to classify existing unlined impoundments as sanitary landfills violates 42 U.S.C. § 6944(a).

## II. IMPOUNDMENTS POSING TWICE THE RISK OF CANCER THAT EPA FINDS ACCEPTABLE PRESENT A REASONABLE PROBABILITY OF ADVERSE EFFECTS TO HEALTH.

EPA defines a lined impoundment to include impoundments with only a two-foot compacted soil liner,[7] 40 C.F.R. § 257.71(a)(1)(i), despite evidence that such impoundments pose human health risks exceeding the levels which EPA considers acceptable.  EPA's rule allows these dangerous impoundments to

---

[6] EPA estimated that over 470 coal-fired electric utilities generated approximately 110 million tons of CCR in 47 states and Puerto Rico in 2012. 80 Fed. Reg. at 21,303, JA___.

[7] EPA uses the terms "compacted soil" and "compacted clay" liner interchangeably.  *Id.* at 21,368 n.62, JA___.

continue operating and does not even require them to close when they contaminate groundwater.  *Id.*§§ 257.96-257.98.  In contrast, if an impoundment is "unlined," it must close upon a determination that it has contaminated groundwater.  *Id.*§ 257.101(a).  EPA's inclusion of impoundments with a two-foot compacted soil liner in the definition of a lined impoundment suffers from two defects.  First, EPA discounts its own data on the risks from impoundments that have only a two-foot soil liner.  Second, EPA still fails to provide any explanation for why it allows existing impoundments to operate with two-foot soil liners when it concluded that such liners in new impoundments are insufficient to protect human health and the environment.

### A. EPA Improperly Discounts Its Own Data Regarding the Necessity of Composite Liners.

EPA's Risk Assessment concluded that an impoundment with only a two-foot compacted soil liner presents a cancer risk from arsenic exposure that is double the acceptable level.  RA at 5-30, Table 5-22, JA___.  EPA responds that "this represents only a slight exceedance of EPA's level of concern, and only for one contaminant."  EPA Br. at 90.

But, on the first point, EPA acknowledges that its level of concern is $1\times10^{-5}$, *id.* at 89, and that soil-lined impoundments pose a risk of $2\times10^{-5}$. RA at 5-30, Table 5-22, JA___.  A risk level twice as high as EPA's level of concern is not a "slight exceedance."  EPA further dismisses this exceedance by claiming that

"uncertainties remain with respect to this estimate." EPA Br. at 90. But EPA's entire rule is based on the data in EPA's Risk Assessment. EPA cannot rely on the Risk Assessment for portions of the rule and then "malign[] the . . . data as too unreliable" for other portions. *Shalala*, 192 F.3d at 1022 (holding that an agency inadequately explained why data were suitable for one calculation but unreliable for another, similar calculation).

Even less plausible is EPA's claim that the cancer risk from soil-lined impoundments can be ignored because the risk is "only for one contaminant," arsenic. EPA Br. at 90. The statute requires EPA to classify facilities as sanitary landfills only if there is "no reasonable probability of adverse effects on health or the environment from disposal of solid waste" at such facilities. 42 U.S.C. § 6944(a). Developing cancer is an "adverse effect[] on health," whether it comes from exposure to one contaminant or multiple contaminants. EPA acknowledges that arsenic is extremely dangerous, as ingestion causes multiple forms of cancer, as well as "nausea, vomiting, abnormal heart rhythm, and damage to blood vessels." RA at ES-6, JA___. Having found that impoundments with a two-foot soil liner pose a reasonable probability of causing cancer from arsenic, *id.* at 5-30, Table 5-22, JA___, EPA cannot disregard that risk simply because it is caused by exposure to only one chemical. As a result, EPA's classification of impoundments with only a two-foot soil liner as sanitary landfills violates 42 U.S.C. § 6944(a).

13

**B.     EPA Fails to Justify Disparate Treatment of New and Existing Surface Impoundments with Respect to Liners.**

EPA fails to offer any basis for treating existing impoundments differently from new impoundments with regard to the liners needed to protect human health and the environment.  EPA leans heavily on its purported discretion in arguing that, even though it requires composite liners for new impoundments, it is justified in including facilities without composite liners in the definition of "existing lined impoundments."  EPA Br. at 92.  As explained above, however, discretion is not a license to act arbitrarily, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  It is the hallmark of arbitrary action for EPA to fail to explain why two categories are regulated differently when they are the same in all relevant respects.  *Transactive Corp.*, 91 F.3d at 237.  EPA provides no evidence that existing impoundments with only a two-foot soil liner pose a lower risk than new impoundments with the same liner, yet EPA's rule allows the existing impoundments to continue operating as "lined" impoundments while banning new ones.  *See* 40 C.F.R. § 257.72(a).

Moreover, EPA acknowledges in its brief that composite liners are "state-of-the-art."  EPA Br. at 81.  These state-of-the art composite liners are precisely what EPA requires for all new impoundments because they are the "only liner type modeled that effectively reduces risks from all pathways and constituents far below human health and ecological criteria in every sensitivity analysis conducted."  RA at ES-7, JA___; *see also* Response to Comments, Volume 5 at 12, JA___.  But

14

EPA fails to require composite liners for existing impoundments, instead defining existing lined impoundments to include facilities with dramatically inferior soil liners, *see* 40 C.F.R. § 257.71(a)(1)(i). As a result, when impoundments with soil liners leak, they can continue operating under the regulations instead of being required to close like unlined impoundments. All impoundments without composite liners should be required to close after evidence of leaking because, without a composite liner, the leaking cannot be controlled and cleanup is not always possible.

EPA wrongly suggests in its brief that composite liners required for new impoundments are over-protective and that allowing existing impoundments to use less effective liner systems is still sufficient to meet the statutory standard. *See* EPA Br. at 92. EPA's *post-hoc* explanation is inconsistent with EPA's repeated statements in the record that composite liners are *necessary* for new impoundments. *See* 80 Fed. Reg. at 21,371, JA___. Arguments asserted for the first time in the context of a legal challenge cannot support otherwise unjustified agency actions. *See Michigan v. EPA*, 135 S.Ct. 2699, 2710 (2015). Arguments contrary to the record evidence are equally unavailing. *See Motor Vehicles Mfrs. Ass'n,* 463 U.S. at 43.

The record contradicts EPA's assertion that monitoring and corrective action are adequate to satisfy the statutory mandate to ensure "no reasonable probability

of adverse effects to health or environment." 42 U.S.C. § 6944(a). Given the record evidence that there will be widespread noncompliance with these requirements, that it is impossible to clean up all coal ash contamination, and that leaking is more severe and rapid from soil-lined impoundments, *see supra* Section I(C)-I(D), EPA cannot rely on monitoring and corrective action to eliminate the reasonable probability of harm from impoundments with only a two-foot soil liner. EPA's reliance on monitoring and corrective action is particularly problematic in light of the fact that the great majority of the nation's largest and most dangerous existing impoundments lack composite liners. Of the 299 high and significant hazard surface impoundments for which liner information is available, 84 percent lack a composite liner. *See* 80 Fed. Reg. at 21,458 n.225, JA____.[8]

In sum, EPA's failure to offer an explanation, rooted in the record, for why it regulates existing impoundments with only a two-foot soil liner less stringently than new impoundments is arbitrary and capricious. *See Transactive Corp.*, 91 F.3d at 237. Allowing impoundments to operate with a two-foot soil liner is also inconsistent with record evidence that only a composite liner is effective at preventing contamination and satisfying 42 U.S.C. § 6944(a).

---

[8] Referencing EPA, Steam Electric Power Industry Technical Questionnaire - Response Database *available at* https://www.epa.gov/eg/steam-electric-power-generating-effluent-guidelines-questionnaire (website given in *Federal Register* notice is incorrect).

III.  **EPA'S EXEMPTION OF INACTIVE IMPOUNDMENTS AT FACILITIES THAT NO LONGER GENERATE ELECTRICITY FROM REGULATION IS ARBITRARY AND CAPRICIOUS.**

EPA estimates that there are 126 inactive coal ash impoundments at coal plants that no longer generate electricity.[9]  RIA at 9-20, JA___.  Because the majority are unlined, Envtl. Pet. Br. at 5, and pose a substantial risk of leaking arsenic into groundwater at dangerous levels, as well as posing a risk of catastrophic collapse, there is a reasonable probability that these impoundments will cause adverse effects on human health and the environment.  According to EPA, inactive impoundments have caused approximately 26 documented cases of damage to groundwater and/or surface water, including six proven damage cases, *see* EPA-HQ-RCRA-2009-0640-12123 ("CCR Damage Case Database"), JA____.

Despite the documented risks, EPA made the unreasonable decision, wholly unsupported by the record, to exempt from regulation the entire universe of inactive impoundments at power plants no longer generating electricity.  This exempted universe of unlined impoundments poses a substantial risk of harm, yet these impoundments escape any safeguards intended to prevent potentially deadly releases.  EPA does not exempt these inactive impoundments because they pose

---

[9] EPA stated in the RIA that 50 plants closed between 2012 and 2016 and an additional 19 plants closed prior to 2012 and that these plants are contained in the NEEDS v.5.13 database.  RIA at 9-20, JA___.  Because the database contains more than 69 plants, the characterizations of universe of closed plants are estimated.

less harm than other inactive impoundments (at active facilities) or because they pose less harm than active impoundments. On the contrary, EPA acknowledges that active and inactive impoundments present identical risks, and EPA has never concluded that inactive impoundments at plants not generating electricity pose a lesser risk. *See* 80 Fed. Reg. at 21,343, JA___. The only reason EPA provides for the exemption is that "the absence of a present operator makes implementation of continuing and ongoing regulatory requirements difficult or often impossible." EPA Br. at 94.

This *post-hoc* rationalization must fail. EPA has identified roughly 30 owners and operators of recently retired power plants where more than 100 inactive impoundments are located. RIA at 9-18–9-20, App. A, JA___.[10] Nearly three quarters of the power plants ceased burning coal for electricity within the last four years. *See id.* It is likely, therefore, that the decommissioning of these facilities is ongoing, in which case the owners are subject to a variety of cleanup requirements. The imposition of additional closure requirements at this time would consequently be neither "difficult" nor "impossible" for the utility companies that operated the impoundments. On the contrary, imposition of the requirements contained in the CCR rule would be timely and efficient. Failure to

---

[10] Citing EPA, National Electric Energy Data System (NEEDS) v.5.13 (last updated Sept. 25, 2015), https://www.epa.gov/airmarkets/documentation-national-electric-energy-data-system-needs-v513.

implement such safeguards presents a high probability of adverse impact on human health and the environment.

EPA provides three basic defenses of its decision to exempt from the rule inactive impoundments at sites that no longer generate electricity. First, EPA invokes "discretion" to justify its action, EPA Br. at 94, but EPA must explain rationally why it exercised its discretion in a given manner. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Here, the record demonstrates that inactive impoundments pose the same risk to health and the environment regardless of whether they are located at a site that is, or is not, generating electricity. EPA's "action is arbitrary" because "the agency offer[ed] insufficient reasons for treating similar situations differently." *Transactive Corp.*, 91 F.3d at 237; *see also Shalala*, 192 F.3d at 1023.

Second, EPA advances for the first time in its brief a rationale never presented in the rulemaking itself: that "the absence of a present operator makes implementation of continuing and ongoing regulatory requirements difficult or often impossible." EPA Br. at 94 (citing 80 Fed. Reg. at 21,344). The preamble language to which EPA refers – from a 1978 proposed rule in which EPA noted that some owners of land where hazardous waste had been disposed of might not have any connection to the prior disposal, *see* Hazardous Waste Guidelines and Regulations, 43 Fed. Reg. 58,946 (Dec. 18, 1978), JA___ – does not support the

19

argument that EPA now attempts to make.  Indeed, nowhere in the preamble does EPA state or even imply that its 1978 rationale for regulating hazardous waste is the basis on which EPA now is exempting from regulation non-hazardous coal ash at facilities no longer generating electricity.  Nor did EPA ever provide this rationale in the proposed rule, *see* Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities, 75 Fed. Reg. 35,128 (June 21, 2010), JA___ or in the relevant section of the Response to Comments document, *see* Response to Comments, Volume 3 at 26-27, JA___.  This Court "may not accept appellate counsel's *post hoc* rationalizations for agency action," as "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

Even if this Court were to consider EPA counsel's *post hoc* rationalization, the explanation is unsupported by the record.  A finding in a 38 year-old proposed rule is not sufficient basis to justify exempting an entire class of waste impoundments created by a very different industry from subtitle D regulation today.  EPA's 1978 proposed rule references only vague concerns about "technical, legal and economic problems [that] would arise if these standards were to be directly applied to inactive facilities."  43 Fed. Reg. at 58,984, JA___.  But the coal ash rule at issue here applies specifically to electric utilities, which are large, stable

companies, and there is nothing in the record demonstrating technical, legal and economic problems with compliance.

Moreover, EPA failed to identify any evidence in the record that facilities no longer generating electricity lack owners who are able to implement the rule's requirements. There is nothing in the record to indicate that owners of inactive facilities, who are usually the same electric utilities that owned the power plants that operated at the sites, are incapable of safely closing the impoundments they left behind.

In fact, the record reflects compelling reasons to address inactive impoundments at sites no longer generating electricity. Two of the proven cases of coal ash contamination occurred at such impoundments. In particular, EPA found that inactive impoundments at the Canadys and Glen Lyn power stations contaminated groundwater and/or surface waters after the generating units had closed. Damage Case Compendium, Vol. I at 129-32, 154-57, 177, JA___. While these two facilities no longer generate electricity, however, each facility is currently owned by an electric utility that is capable of implementing the final rule's requirements – contrary to EPA's *post hoc* assertion in its brief. *See id.* at 129-32, 154-57, 177, JA___.

In addition, two leaking surface impoundments at closed power plants – Ameren's retired Meredosia Power Station and Prairie Power's retired Pearl

21

Station – are cited by EPA as examples of why EPA must address contamination at inactive sites.[11]  80 Fed. Reg. at 21,343, JA___; *see also* CCR Damage Case Database, JA___.   According to EPA, the risks posed by these inactive impoundments "are the risks the disposal rule specifically seeks to address, and there is no logical basis for distinguishing between units that present the same risks."  80 Fed. Reg. at 21,343, JA___.  There is nothing in the record to indicate that the facility's current owner is unable to implement the rule's requirements. EPA's assertion that inactive impoundments at inactive facilities lack an owner who could implement the rule "runs counter to the evidence before the agency" and is therefore arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Next, EPA argues that its ability to file suit on a case-by-case basis when a facility presents an imminent and substantial endangerment, 42 U.S.C. § 6973, negates the need to apply the final rule to inactive impoundments at facilities no longer generating electricity.  EPA Br. at 94-98.  This notion cannot be reconciled with the fact that EPA was compelled to undertake this rulemaking despite already having the authority conferred by the imminent and substantial endangerment provision.  To the contrary, EPA concludes that "inactive CCR surface

---

[11] Two additional inactive impoundments in Illinois at retired power plants are listed in EPA's Damage Case Compendium, Dynegy's Vermilion and Ameren's Hutsonville plants. *See* CCR Damage Case Database.

impoundments require *regulatory* oversight," 80 Fed. Reg. at 21,342 (emphasis added), JA___, and EPA fails to explain why a different conclusion applies to inactive impoundments at plants no longer generating electricity.

EPA's contention, EPA Br. at 95-97, that the imminent and substantial endangerment provision, 42 U.S.C. § 6973, is functionally equivalent to the standard in subtitle D, *id.* § 6944(a), has no merit.  42 U.S.C. § 6973 authorizes EPA to file suit in a federal district court to curtail activities that "may present an imminent and substantial endangerment."  By contrast, 42 U.S.C. § 6944(a) authorizes EPA to issue regulations prohibiting open dumping to ensure "no reasonable probability of adverse effects on health or the environment."  Not only are the two legal standards markedly different on their face, but 42 U.S.C. § 6973 requires EPA to litigate against each and every facility it seeks to address, whereas 42 U.S.C. § 6944(a) authorizes EPA to issue regulations governing an entire industry before an imminent hazard may present itself.

Finally, Industry Intervenors argue that EPA lacks authority to regulate all inactive impoundments under RCRA subtitle D.  Indus. Intervenor Br. at 9-15.  For a thorough response to this argument, Petitioners refer the Court to their intervenor brief, which Petitioners here incorporate by reference.  *See* Envtl. Intervenor Br. at 2-12.

### IV. EPA FAILS TO JUSTIFY ITS PROVISIONS ALLOWING FOR LATE NOTICE, WHICH DO NOT ENSURE NO REASONABLE PROBABILITY OF ADVERSE EFFECTS.

EPA argues that no party "submitted comments asserting that website notice had to be made at a particular point in time in order to be, in their view, fully effective." EPA Br. at 99. But the specific regulatory provisions regarding public notice challenged here were not included in the co-proposal.[12] 75 Fed. Reg. 35,128, JA____. Further, any reasonable person would assume that public notice would occur before an irreversible commitment of resources to allow for meaningful public participation. Instead, EPA's regulations allow public notice regarding compliance with the liner requirements to occur after ash dumping begins in a new unit, meaning the public cannot participate effectively in ensuring that the design requirements are implemented. Envtl. Pet. Br. at 48-49.

More egregiously, citizens opposing new units or expansions that are within five feet of groundwater, in wetlands, or above sinkholes, for example, cannot timely oppose a unit based on the location criteria because such certifications are not required until the dumping begins, meaning they do not have to obtain certifications before building the units. *Id.* at 49-50. Because the certifications need not be posted for 30 days, there is no guarantee that dumping will not begin

---

[12] Environmental Petitioners did comment on the need for permitting as a vehicle by which "the public can be informed and participate in the siting, operation and closure of the waste disposal unit." Earthjustice et al. Comments, EPA-RCRA-2009-0640-6315 at 192-93, JA___.

24

prior to certification.  In states where state regulatory agencies require permits, this timing will make it extremely difficult if not impossible for citizens to raise critical location issues during the permitting process.  Moreover, for wetlands, irreversible environmental damage can occur during construction (when the excavation occurs and the liner and leachate collections systems are installed), not only when coal ash is received.

By failing to provide timely notice to the public of the activities subject to the design requirements and location restrictions, EPA has violated the statutory mandate to provide for public participation in implementing and enforcing the regulations, *see* 42 U.S.C. § 6974(b)(1).  In addition, the failure to require timely public notice violates EPA's duty to ensure "no reasonable probability of adverse effects," *id.* § 6944(a), given EPA's findings that "it cannot conclude that the RCRA subtitle D regulations will ensure there is no reasonable probability of adverse effects on health or the environment, unless there is a mechanism for states and citizens to monitor the situation."  75 Fed. Reg. at 35,195, JA____.

## CONCLUSION AND RELIEF REQUESTED

For the reasons given above, Petitioners request that the Court:

(1) Find that rule's classification of existing unlined surface impoundments as "sanitary landfills" is arbitrary and capricious and violates 42 U.S.C. § 6944(a) and remand the issue to EPA for further consideration;

(2) Vacate and remand the provision of the final rule defining existing surface impoundments with only a two-foot soil liner as "lined," 40 C.F.R. § 257.71(a)(1)(i), because it violates 42 U.S.C. § 6944(a) and is arbitrary and capricious;

(3) Vacate and remand the provision of the final rule exempting inactive impoundments at inactive power plants from regulation, 40 C.F.R. § 257.50(e), because it violates 42 U.S.C. § 6944(a) and is arbitrary and capricious; and

(4) Find that EPA's failure to provide timely notice to the public of the activities subject to the design requirements and location restrictions violates the public participation requirements, 42 U.S.C. § 6974(b)(1), violates 42 U.S.C. § 6944(a), and is arbitrary and capricious, and remand the issue to EPA for further consideration.

To further EPA's statutory mandate to ensure that there is no reasonable probability of adverse effects to health and the environment, 42 U.S.C. § 6944(a), Petitioners request that the remaining provisions of the rule be left in place during the pendency of the remand.

Respectfully submitted,


<u>/s/ Mary M. Whittle</u>
Mary Whittle
Earthjustice
3904 Bonnell Drive
Austin, TX 78731
(512) 537-2791
mwhittle@earthjustice.org

Matthew Gerhart
Earthjustice
633 17th St., Suite 1600
Denver, CO 80202
(303) 623-9466
mgerhart@earthjustice.org

Lisa Evans
Earthjustice
21 Ocean Ave.
Marblehead, MA 01945
(781) 631-4119
levans@earthjustice.org

*Counsel for Environmental Petitioners*

# CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Proof Brief for Environmental Petitioners contains 5,938 words, as counted by counsel's word processing system, and thus complies with the applicable word limit established by the Court.

DATED: July 14, 2016

/s/ Mary M. Whittle
Mary M. Whittle

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2016, I have served the foregoing Proof Reply Brief of Environmental Petitioners on all registered counsel through the Court's electronic filing system (ECF).

/s/ Mary M. Whittle
Mary M. Whittle