## ORAL ARGUMENT NOT YET SCHEDULED

### Case No. 15-1219 (and consolidated cases)

### UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

### UTILITY SOLID WASTE ACTIVITIES GROUP, *et al.*,
Petitioners

**v.**

### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
Respondents

Petitions for Review of 80 Fed. Reg. 21,302 (Apr. 17, 2015)

## FINAL BRIEF OF INDUSTRY INTERVENOR-RESPONDENTS

### AMERICAN PUBLIC POWER ASSOCIATION, EDISON ELECTRIC INSTITUTE, NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, AND UTILITY SOLID WASTE ACTIVITIES GROUP

DOUGLAS H. GREEN
JOHN F. COONEY
MARGARET K. KUHN
Venable LLP
575 7th Street NW
Washington, DC 20002
(202) 344-4483
dhgreen@venable.com

*Counsel for Industry Intervenor-Respondents*

DATE: September 6, 2016

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28 and D.C. Circuit Rules 26.1 and 28(a)(1), Industry Intervenor-Respondents ("Industry Intevenors") hereby certify as follows:

### 1.     Parties and *Amici*

These consolidated cases involve seven separate petitions for direct review of a final action of the U.S. Environmental Protection Agency. Accordingly, the requirement of D.C. Circuit Rule 28(a)(1) to list the parties, intervenors, and *amici* that appeared in the court below does not apply. The parties, intervenors, and *amici* participating in this Court are listed in the Brief of Industry Petitioners.[1]

### 2.     Ruling Under Review

References to the ruling at issue appear in the Brief of Industry Petitioners.

### 3.     Related Cases

These cases were not previously before this Court or any other court. At this time, to the knowledge of undersigned counsel, there are no other related cases currently pending in this Court or any other court.

---

[1] Industry Petitioners are AES Puerto Rico, LP; American Public Power Association; Associated Electric Cooperative, Inc.; Beneficial Reuse Management; City of Springfield, Missouri; Edison Electric Institute; Lafarge Building Materials Inc.; Lafarge Midwest, Inc.; Lafarge North America Inc.; National Rural Electric Cooperative Association; and Utility Solid Waste Activities Group.

### 4.     Corporate Disclosure Statements

The American Public Power Association ("APPA") is the national association of publicly-owned electric utilities.   APPA has no outstanding shares or debt securities in the hands of the public.  APPA has no parent company.  No publicly held company has a ten percent (10%) or greater ownership in APPA.

Edison Electric Institute ("EEI") is the principal national association of investor-owned electric utility companies.  EEI has no outstanding shares or debt securities in the hands of the public.  EEI has no parent company.  No publicly-owned company has a ten percent (10%) or greater ownership interest in EEI.

The National Rural Electric Cooperative Association ("NRECA") is the nonprofit national trade association for electric cooperatives. On behalf of its members, NRECA participates in administrative and judicial proceedings involving or affecting its members' interests.  NRECA has no parent company.  No publicly held company has a ten percent (10%) or greater ownership interest in NRECA. NRECA is an incorporated entity.

The Utility Solid Waste Activities Group ("USWAG") is an association of approximately one hundred and ten individual electric utilities, as well as EEI, NRECA, and APPA, that represents the electric industry on rulemaking and administrative proceedings before EPA under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*., and in litigation arising from such

proceedings that affect its members. USWAG members are affected by the final action of the United States Environmental Protection Agency ("EPA") that is challenged in this proceeding. USWAG has no parent company. USWAG does not have any outstanding shares or debt securities in the hands of the public and no publicly-owned company has a ten percent (10%) or greater ownership interest in USWAG.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT .................................................... i

TABLE OF CONTENTS ......................................................................... iv

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY ........................................................................................ vii

STATUTES AND REGULATIONS ....................................................... 1

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ....................................................................................... 4

    I.    EPA reasonably concluded that as long as an unlined surface impoundment is not leaking, it does not pose a reasonable probability of adverse effects to health or the environment and need not be closed. ....... 5

    II.   EPA does not have the authority to regulate legacy ponds under Subtitle D. ................................................................................... 9

CONCLUSION .................................................................................. 16

CERTIFICATE OF COMPLIANCE .................................................... 17

CERTIFICATE OF SERVICE ............................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B.F. Goodrich Co. v. Murtha*,
   958 F.2d 1192 (2d Cir. 1992) ...............................................................14
*Eagle Picher Indus., Inc. v. E.P.A.*,
   759 F.2d 922 (D.C. Cir. 1985) ..............................................................15
*S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*,
   372 F.3d 245 (4th Cir. 2004) ................................................................14

**Statutes**

*42 U.S.C. § 6903(3) .............................................................................10
*42 U.S.C. § 6903(14) ......................................................................10, 11
*42 U.S.C. § 6903(26) ......................................................................10, 11
42 U.S.C. §§ 6941-6949a ........................................................................1
42 U.S.C. § 6944(a) ....................................................................5, 10, 11
42 U.S.C. § 6972(a)(1)(B) ..................................................................3, 12
42 U.S.C. § 6973(a) .....................................................................3, 11, 12
42 U.S.C. §§ 9601-9675 ..........................................................................4
42 U.S.C. § 9606 ....................................................................................15
42 U.S.C. § 9625(b) ...............................................................................15

**Rules**

D.C. Cir. R. 28(d)....................................................................................4

**Regulations**

40 C.F.R. § 257.71(a)(3)..........................................................................8
40 C.F.R. § 257.95(g)(5)..........................................................................6
40 C.F.R. § 257.98(c)...............................................................................6

**Federal Register**

48 Fed. Reg. 40658 (Sept. 8, 1983) ......................................................15
80 Fed. Reg. 21,302 (April 17, 2015)...............................................1, 7, 8

**\*Authorities upon which we chiefly rely are marked with asteriks.**

v

## Other Authorities

Hazardous and Toxic Waste Disposal: Joint Hearings on S. 1341 and
    S. 1480 Before the Subcomms. on Envtl. Pollution and Res. Prot.
    of the S. Comm. on Env't and Pub. Works, 96th Cong. 3 (1979)......................14

Ind. Ground Water Removal Action, Admin. Order by Consent, No.
    V-W-03-C730 (EPA, Region 5 Jan. 23, 2003)...................................................15

*Report on Hazardous Waste Disposal, Subcomm. on Oversight &
    Investigations, H. Comm. On Interstate & Foreign Commerce,
    96th Cong., 1st Sess., H.R. Comm. Print 96 IFC-31 (Sept. 1979).....................13

# **GLOSSARY**

"CCR" means coal combustion residuals.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*

"EPA" means United States Environmental Protection Agency.

"JA" means Joint Appendix.

"RCRA" means the Resources Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*

"Rule" means 80 Fed. Reg. 21,302 (Apr. 17, 2015), codified at 40 C.F.R. Part 257.

## STATUTES AND REGULATIONS

Except for the statutes contained in the addendum to this brief, all applicable statutes and regulations appear in the briefs and addenda of the Industry Petitioners, Environmental Petitioners, and Respondent U.S. Environmental Protection Agency ("EPA" or "the agency").

## SUMMARY OF ARGUMENT

Environmental Petitioners' challenge[2] to EPA's final rule entitled "Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals ["CCR"] From Electric Utilities," 80 Fed. Reg. 21,302 (Apr. 17, 2015), JA157 (the "Rule") fails for several reasons.

First, Environmental Petitioners' contention that EPA must require all unlined CCR surface impoundments to close is based on a purported standard that is far more stringent than the "reasonable probability" test Congress requires EPA to apply under Subtitle D of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6941-6949a. They argue that EPA was required to adopt a rule compelling all unlined impoundments to close based on speculation that some of these units may leak at some point in the future. But Environmental Petitioners themselves concede that the majority of unlined impoundments are not leaking and

---

[2] As explained below, Industry Intervenors (referred to collectively as "USWAG") respond only to the arguments raised in Sections I (continued operation of unlined impoundments) and III (failure to regulate legacy ponds) of Environmental Petitioners' Opening Brief.

may never leak.  They also fail to discuss the facts in the record on which EPA relied in concluding that the Rule as adopted will ensure that there is no "reasonable probability of adverse effects on health and the environment."   Environmental Petitioners seek to create the impression that the Rule essentially imposes no regulatory controls over unlined impoundments, but they conveniently ignore the fact that under the final regulation, an unlined impoundment that actually leaks must close or be retrofitted with a Rule-compliant liner system.

Thus, contrary to Environmental Petitioners' statements, leaking unlined CCR surface impoundments are *not* allowed to continue operating under the Rule.  Rather, they are controlled under a regulatory system—which imposes requirements on a case-by-case basis on impoundments that actually leak—different from the mandatory closure approach Environmental Petitioners would have preferred that EPA adopt.  Based on the record, EPA reasonably determined that Subtitle D does not require the mandatory closure of all unlined surface impoundments and that unlined impoundments that do not leak should be allowed to continue operating.

Second, Environmental Petitioners' attack on EPA's decision not to regulate "legacy" CCR surface impoundments—meaning inactive impoundments that are located at closed power plants and in which CCR is no longer disposed of—is founded on a flawed reading of the statute.  Although EPA bases its decision on policy considerations, the decision not to regulate legacy ponds is correct for yet

2

another reason—EPA does not have the authority in the first instance to regulate legacy impoundments under RCRA Subtitle D. This is because EPA's statutory authority under Subtitle D extends only to units in which solid waste is disposed as of the effective date of the Rule. Legacy impoundments ceased being used for the disposal of CCR before the effective date of the Rule—in some cases, decades before the Rule was promulgated—and are not subject to retroactive regulation through adoption of a broad rule applicable to all inactive impoundments at closed plants.

While Environmental Petitioners are incorrect in their argument that Congress gave EPA authority in Subtitle D to adopt such a sweeping rule, Congress did not leave the potential risks from legacy impoundments unaddressed in RCRA, but rather addressed the problem in a different manner. Congress provided both EPA and any person, including Environmental Petitioners, with the authority to bring suit for the "past" disposal practices at legacy impoundments that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. §§ 6972(a)(1)(B), 6973(a). As EPA points out, the bar for bringing an imminent and substantial suit is not as demanding as Environmental Petitioners suggest. Resp. Br. 95-97.

Even the authorities cited by Environmental Petitioners belie their claim that EPA's Rule must encompass legacy impoundments. The legislative history and cases cited by Environmental Petitioners make clear that it is precisely because

3

RCRA generally does *not* address inactive units, such as legacy impoundments, that Congress subsequently enacted the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, to give EPA the authority to address the risks posed by abandoned and inactive units. Further, Environmental Petitioners are simply wrong in their contention that legacy CCR ponds are somehow exempt from CERCLA remedial action.  In fact, EPA has addressed contamination from CCR disposal sites using both the National Priority List and its administrative order authority under CERCLA.  Therefore, contrary to Environmental Petitioners' claim, legacy CCR impoundments cannot be regulated under the Rule.

## ARGUMENT

USWAG recognizes that, pursuant to D.C. Circuit Rule 28(d), an intervenor brief must avoid repetition of facts or legal arguments made in the principal respondent's brief.  Upon reviewing EPA's Response Brief filed April 18, 2016, USWAG believes that EPA has comprehensively addressed the challenges raised by Environmental Petitioners in Sections II (two-foot clay liner) and VI (adequate public notice) of their Opening Brief.  Thus, the arguments presented below respond only to the arguments raised in Sections I (continued operation of unlined

impoundments) and III (failure to regulate legacy ponds) of Environmental Petitioners' Opening Brief.[3]

## I.   EPA reasonably concluded that as long as an unlined surface impoundment is not leaking, it does not pose a reasonable probability of adverse effects to health or the environment and need not be closed.

Environmental Petitioners have challenged EPA's decision to allow unlined CCR surface impoundments to continue to operate, arguing that the leaks from such units present too great a risk to the environment and public health. Env. Pet. Br. 19–27. But Environmental Petitioners do not support this argument using the "reasonable probability" standard required by Subtitle D of RCRA. Rather, Environmental Petitioners use overstatements and rhetoric to disguise the fact that they seek to apply a more stringent standard to the Rule's management criteria than the one Congress actually adopted.

When establishing regulations under Subtitle D, EPA must meet one statutory standard: to ensure that "there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste." 42 U.S.C. § 6944(a). Thus, the question before the Court is not whether the rule "reduce[s] risks from all pathways and constituents far below human health and ecological criteria," as Environmental Petitioners contend. *See* Env. Pet. Br. 21 (internal quotations

---

[3] USWAG does not address the arguments raised in Sections IV and V of the Environmental Petitioners' Opening Brief, as EPA has moved to remand the subsections of the Rule challenged in those Sections.

omitted).  And it is not whether an unlined surface impoundment poses more risks than a lined surface impoundment.  *See id.* at 21–22.  Rather, the sole question before the Court is whether EPA reasonably determined that the continued operation of unlined surface impoundments that are demonstrably *not leaking—i.e.*, not impacting groundwater above prescribed groundwater protection standards—combined with the imposition of appropriate controls on impoundments that do leak, will result in "no reasonable probability of adverse effects."   The facts on which EPA relied demonstrate that the answer is undoubtedly "yes."

Environmental Petitioners assert that EPA has failed to meet the Subtitle D standard by allowing unlined surface impoundments to continue operating indefinitely.  Env. Pet. Br. 19.   But—in a glaring oversight—Environmental Petitioners fail to mention that unlined surface impoundments can remain open *only if the unit is not leaking*.  On the *first* indication that an unlined unit is leaking in a manner that causes an exceedance of a prescribed groundwater protection standard, it must cease receiving CCR and either close or retrofit with a rule-compliant liner. 40 C.F.R. § 257.95(g)(5).  And of course, as with any other CCR unit that impacts groundwater, the owner/operator must take corrective action to address the contamination.   *Id.*   This corrective action must continue until prescribed groundwater protection standards are met.  *Id.* § 257.98(c).

6

Contrary to Environmental Petitioners' implication, unlined surface impoundments do not get a free pass. In fact, quite the opposite is true; unlined impoundments are the most stringently regulated class of units under the rule. In seeking to persuade the Court that closure of all unlined impoundments is the only possible outcome permitted by the statute, the challengers simply ignore the controls EPA actually put in place and the evidence on which it relied in performing the "reasonable probability" assessment.

Environmental Petitioners rely on EPA's Risk Assessment to show that leaking unlined surface impoundments pose an unacceptable risk to human health and the environment. Env. Pet. Br. 21–24. But EPA did not, as Environmental Petitioners contend, ignore this finding. Recognizing that the risks associated with unlined impoundments stem from leaks, EPA concluded that these units can continue to operate—and meet the Subtitle D standard—as long as groundwater monitoring demonstrates that the unit is not leaking. 80 Fed. Reg. at 21,371, JA226. This conclusion is more than reasonable, given that the majority of unlined impoundments *will not* leak. As Environmental Petitioners themselves recognize, only 36.2% of unlined surface impoundments will contaminate groundwater at some point in the future. Env. Pet. Br. 23, citing JA1112. This means that almost two-thirds of unlined impoundments *do not* leak.

Importantly, these percentages include only the truly unlined impoundments evaluated in EPA's Risk Assessment—not other impoundments that physically contain a liner system but nonetheless are considered "unlined" under the Rule.[4]  For example, some impoundments have a double liner system, consisting of two geomembranes with a leak detection system between the two layers, and meet current state regulatory requirements.  80 Fed. Reg. at 21,370, JA225; *see also* Comments of Florida Electric Power Coordinating Group, Inc. on the Proposed CCR Rule at 41-42, JA1004–05.  These impoundments—though more protective than the truly unlined surface impoundments evaluated in the Risk Assessment—are considered "unlined" under the Rule because a double liner system does not meet the Rule's specific performance standard.  *See id.*; 40 C.F.R. § 257.71(a)(3).  This means that the entire universe of "unlined" impoundments is even less prone to leaks than stated in the Risk Assessment.

Despite these facts, Environmental Petitioners nonetheless contend that all "unlined" surface impoundments—even though a majority will not leak—must

---

[4] The Risk Assessment considered three liner scenarios: (1) impoundments where the waste is placed directly on local soils ("no liner"); (2) impoundments where the waste is placed directly on a compacted clay liner ("clay liner"); and (3) impoundments where the waste is placed on a liner system that consists of a membrane underlain by a clay liner ("composite liner").  In cases where data indicated that the impoundment was lined, but the type of liner was not specified, a clay or composite liner was selected probabilistically based on the relative prevalence of clay and composite liners.  Risk Assessment at 4-8 – 4-9, JA1024–25.

close. This contention turns the Subtitle D "no reasonable probability" standard into a statutory mandate to close all unlined impoundments, regardless of the risk these units actually pose. The statute, of course, does not establish such a mandate. If Environmental Petitioners desire a prohibition on all unlined impoundments, their remedy is with Congress, not this Court.

For the foregoing reasons, and for the reasons stated in Respondent EPA's Response Brief, the Court should find that EPA reasonably determined that unlined impoundments meeting the Rule's management criteria—including groundwater protection standards—do not pose a reasonable probability of adverse effects.

## II. EPA does not have the authority to regulate legacy ponds under Subtitle D.

Environmental Petitioners challenge EPA's decision not to regulate CCR surface impoundments that are located at facilities no longer generating electricity and therefore no longer receiving CCR as of the effective date of the Rule (referred to by Environmental Petitioners as "legacy ponds"). Env. Pet. Br. 31–36. USWAG supports EPA's decision to exclude legacy ponds from regulation under the CCR Rule, but does so based on an additional rationale not provided by EPA. EPA states that it made a policy choice not to regulate such units. Resp. Br. 94, citing 80 Fed. Reg. at 21,344, JA199. But, in fact, EPA *cannot* lawfully regulate legacy units under the Rule, as Subtitle D does not provide EPA the authority to regulate disposal

practices—including past disposal practices in legacy units—that ceased prior to promulgation of the Rule.

RCRA Subtitle D is written in the present tense and authorizes EPA to regulate present and future disposal practices. Subtitle D requires EPA to establish criteria for determining "which facilities shall be classified as sanitary landfills and which shall be classified as open dumps within the meaning of this chapter." 42 U.S.C. § 6944(a). An "open dump"—which is prohibited under Subtitle D—is defined as "any facility or site where solid waste *is disposed of* which is not a sanitary landfill" meeting the criteria established by EPA.[5] 42 U.S.C. § 6903(14) (emphasis added). Accordingly, only CCR surface impoundments in which CCR *is disposed of* and that do not meet the Rule's management criteria can qualify as "open dumps." Nothing in the plain language of Subtitle D extends the "open dump" prohibition— and the permissible scope of EPA's implementing regulations—to legacy impoundments where waste *was disposed of* in the past but no longer *is disposed of* after the effective date of the Rule.

---

[5] A "sanitary landfill" is defined as a "facility for the disposal of solid waste which meets the criteria published under section 6944 of [Subtitle D]." 42 U.S.C. § 6903(26). This definition is also written in the present tense, as the operative term "disposal" is defined in the present tense to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water… ." *Id.* § 6903(3).

Contrary to Environmental Petitioners' assertion, whether or not legacy ponds pose the same risks as CCR surface impoundments at facilities still generating electricity is irrelevant to EPA's authority under Subtitle D. *See* Env. Pet. Br. 32-33. The scope of Subtitle D is limited to the universe of units that are considered "sanitary landfills" or "open dumps" "within the meaning of [Subtitle D]." 42 U.S.C. § 6944(a). As explained above, the scope of these two terms is limited to units where waste *is disposed of*. *See* 42 U.S.C. §§ 6903(14), 6903(26). It is only for this universe of units that EPA has statutory authority to establish criteria to ensure that "there is no reasonable probability of adverse effects on health or the environment."

This does not mean that legacy ponds are left completely unaddressed under the proper interpretation of RCRA or that the risks posed by such units are ignored under the statutory system adopted by Congress. As EPA points out, Congress has provided other effective mechanisms to address the types of risks posed by legacy ponds. Resp. Br. 94–95. In particular, Section 7003 of RCRA gives EPA the authority to address "*past or present* handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste [which] may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6973(a). This "imminent and substantial endangerment" provision explicitly applies to *all* disposal practices, whether occurring before or after criteria are established by EPA

11

under Subtitle D.[6]  *Id.*; *see also* Resp. Br. 94-97 (discussing EPA's authority under Section 7003).  As EPA correctly acknowledges, the bar to bringing such suits to address the alleged risks from legacy sites is lower than Environmental Petitioners suggest.  *See* Resp. Br. 95–97.  The fact that Environmental Petitioners would have preferred that Congress adopt different tools to control risks from legacy ponds does not magically broaden EPA's authority under Subtitle D beyond the mechanisms Congress actually adopted to cover past disposal practices.

Environmental Petitioners themselves acknowledge that RCRA is a "prospective act."  Env. Pet. Br. 34.  But—in a curious attempt to support their argument that Subtitle D reaches legacy ponds—they misconstrue "prospective" as meaning that RCRA as a whole is intended to prevent harms before they occur.  In fact, the legislative history cited by Environmental Petitioners clearly demonstrates that by using the term "prospective," Congress meant that RCRA was intended to address disposal practices prospectively, and not the risks from past disposal practices.  This legislative history repeatedly highlights that, other than EPA's imminent and substantial endangerment authority in section 7003 that specifically

---

[6] Similarly, RCRA allows citizen suits to be brought against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

12

addresses "past disposal" practices from solid waste (including CCR), RCRA does

not otherwise reach past disposal practices:

> RCRA is basically a prospective act designed to prevent improper
> disposal of hazardous waste in the future. *The only tool that it has to
> remedy the effects of past disposal practices which were not sound is
> its [imminent and substantial endangerment] authority*.

Report on Hazardous Waste Disposal, Subcomm. on Oversight & Investigations, H.

Comm. on Interstate & Foreign Commerce, 96th Cong., 1st Sess., H.R. Comm. Print

96 IFC-31, at 31 (Sept. 1979) (emphasis added); *see also id.* at 7 ("[RCRA] is

prospective and *applies to past sites only to the extent that they are posing an

imminent hazard*.") (emphasis added); *id.* at 48–49 (discussing Congress' failure to

regulate "inactive waste disposal facilities" under RCRA except to the extent they

pose an imminent hazard); *id.* at 57 ("While EPA can take emergency action to force

cleanup of a site which presents an imminent hazard to the public health or the

environment, *RCRA did not provide for comprehensive regulation of abandoned and

inactive generator-owned sites*.") (emphasis added).

Notably, these statements were made by the House of Representatives,

Subcommittee on Oversight and Investigations in a report discussing the ongoing

risks from waste disposal practices despite RCRA's enactment three years earlier.

*See id.* at 1–3. The finding in this report—that there was, as discussed above, an

"important regulatory gap[]" left by RCRA—is what thereafter led Congress to enact

CERLCA.  *Id.* at 7.[7]  CERCLA provides EPA the authority to address the risks posed by abandoned and inactive waste units.  The cases cited in Environmental Petitioners' own argument (Env. Pet. Br. 34) demonstrate that it is through CERCLA—not RCRA's Subtitle D program—that Congress sought to address the risks from legacy ponds.  While RCRA "imposes tough standards for operating *active* toxic waste sites," it "does not cover sites operated *prior* to its enactment."  *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1202 (2d Cir. 1992) (emphasis in original).  On the other hand, "CERCLA establishes a cleanup program for hazardous waste which has already been disposed of."  *S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 256 (4th Cir. 2004).

Environmental Petitioners seek to persuade the Court to ignore the separate roles and coverage of RCRA and CERCLA by arguing that legacy ponds are somehow exempt from listing on the National Priority List ("NPL") under CERCLA, and that Subtitle D therefore must apply to past disposals of CCR.  *See*

---

[7] *See also* Hazardous and Toxic Waste Disposal: Joint Hearings on S. 1341 and S. 1480 Before the Subcomms. on Envtl. Pollution and Res. Prot. of the S. Comm. on Env't and Pub. Works, 96th Cong. 3 (1979) (opening statement of Sen. Muskie) ("Today we begin to discuss solutions to the problems posed by abandoned and inactive wastes sites. … Our present laws are not enough."); *id.* at 31 (statement of Thomas C. Jorling, Assistant Admin., Waste and Waste Mgmt., EPA) ("Our current statutory authority for coping with these interrelated problems is, unfortunately, inadequate. [RCRA] focuses on present and future hazardous waste disposal practices, and, while it contains an emergency powers clause [the imminent and substantial endangerment provision], it requires an identifiable [sic], financially solvent liability party and prolonged judicial action for its successful invocation.").

Env. Pet. Br. 35.  That argument ignores the facts.  CERCLA requires that if CCR disposal units are to be included on the NPL, such listing must be based on the concentrations of the hazardous constituents in CCR, and not solely on the volume of CCR contained in the unit.  42 U.S.C. § 9625(b).  And in fact, CCR disposal sites have been listed on the NPL.  *See, e.g.*, 48 Fed. Reg. 40,658, 40,671 (Sept. 8, 1983) (Chisman Creek[8]); *see also Eagle Picher Indus., Inc. v. E.P.A.*, 759 F.2d 922 (D.C. Cir. 1985) (finding that fly ash is a hazardous substance subject to the NPL). EPA has also initiated non-NPL removal actions under section 106 of CERCLA, 42 U.S.C. § 9606, at areas impacted by contamination from CCR disposal activities (whether legacy or not).  *See, e.g.*, Town of Pines, Ind. Ground Water Removal Action, Admin. Order by Consent, No. V-W-03-C730 (EPA, Region 5 Jan. 23, 2003).  Accordingly, Environmental Petitioners' argument is meritless.

Based on the foregoing, it is clear that the plain language of RCRA does not provide EPA the authority to regulate legacy ponds under Subtitle D, and that such units are properly within the scope of CERCLA and section 7003 of RCRA.  The Court should therefore reject Environmental Petitioners' assertion that EPA unlawfully failed to regulate such legacy ponds under the Rule.

---

[8] Chisman Creek is a 27-acre site where over 500,000 tons of fly ash from the Yorktown Power Generating Station were disposed from 1957 to 1974.  EPA Superfund Program: Chisman Creek, York County, VA, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0302756&msspp=med (last visited May 17, 2016).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Environmental Petitioners' petition for review.

Respectfully submitted,

/s/ Douglas H. Green
DOUGLAS H. GREEN
JOHN F. COONEY
MARGARET K. KUHN
Venable LLP
575 7th Street NW
Washington, DC 20002
(202) 344-4483
dhgreen@venable.com

*Counsel for Industry Intervenor-Respondents*


DATED:     September 6, 2016

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and this Court's briefing order of November 17, 2105 because this brief contains 3,614 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(e)(1).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in 14 pt. Times New Roman font.


DATED:     Sept. 6, 2016                    /s/ Douglas H. Green
                                       Douglas H. Green

17

## <u>CERTIFICATE OF SERVICE</u>

Pursuant Fed. R. of App. P. 25 and D.C. Circuit Rule 25(c), I hereby certify that I have this 6th day of September 2016, served a copy of the foregoing Brief of Industry Intervenor-Respondents, including the Addendum thereto, on all counsel of record electronically through the Court's CM/ECF system or by U.S. mail, postage prepaid.

/s/ Douglas H. Green
Douglas H. Green

18

**Case No. 15-1219 (and consolidated cases)**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**UTILITY SOLID WASTE ACTIVITIES GROUP,** *et al.*,
**Petitioners**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.*,
**Respondents**

Petitions for Review of 80 Fed. Reg. 21,302 (April 17, 2015)

## ADDENDUM:

## PERTINENT STATUTES AND REGULATIONS

# TABLE OF CONTENTS

**STATUTES:**

42 U.S.C. § 9606 ................................................................................A1

42 U.S.C. § 9625 ................................................................................A3

Fund for gathering and analysis of information which will enable the President to consider the specific factors required by paragraph (2).

**(h) NPL deferral**

**(1) Deferral to State voluntary cleanups**

At the request of a State and subject to paragraphs (2) and (3), the President generally shall defer final listing of an eligible response site on the National Priorities List if the President determines that—

(A) the State, or another party under an agreement with or order from the State, is conducting a response action at the eligible response site—

(i) in compliance with a State program that specifically governs response actions for the protection of public health and the environment; and

(ii) that will provide long-term protection of human health and the environment; or

(B) the State is actively pursuing an agreement to perform a response action described in subparagraph (A) at the site with a person that the State has reason to believe is capable of conducting a response action that meets the requirements of subparagraph (A).

**(2) Progress toward cleanup**

If, after the last day of the 1-year period beginning on the date on which the President proposes to list an eligible response site on the National Priorities List, the President determines that the State or other party is not making reasonable progress toward completing a response action at the eligible response site, the President may list the eligible response site on the National Priorities List.

**(3) Cleanup agreements**

With respect to an eligible response site under paragraph (1)(B), if, after the last day of the 1-year period beginning on the date on which the President proposes to list the eligible response site on the National Priorities List, an agreement described in paragraph (1)(B) has not been reached, the President may defer the listing of the eligible response site on the National Priorities List for an additional period of not to exceed 180 days if the President determines deferring the listing would be appropriate based on—

(A) the complexity of the site;

(B) substantial progress made in negotiations; and

(C) other appropriate factors, as determined by the President.

**(4) Exceptions**

The President may decline to defer, or elect to discontinue a deferral of, a listing of an eligible response site on the National Priorities List if the President determines that—

(A) deferral would not be appropriate because the State, as an owner or operator or a significant contributor of hazardous substances to the facility, is a potentially responsible party;

(B) the criteria under the National Contingency Plan for issuance of a health advisory have been met; or

(C) the conditions in paragraphs (1) through (3), as applicable, are no longer being met.

(Pub. L. 96–510, title I, §105, Dec. 11, 1980, 94 Stat. 2779; Pub. L. 99–499, title I, §105, Oct. 17, 1986, 100 Stat. 1625; Pub. L. 107–118, title II, §232, Jan. 11, 2002, 115 Stat. 2379.)

REFERENCES IN TEXT

This chapter, referred to in subsecs. (a), (b), (c)(4), (f), and (g)(4), was in the original ''this Act'', meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

Section 1321(c)(2) of title 33, referred to in subsec. (a), was amended generally by Pub. L. 101–380, title IV, §4201(a), Aug. 18, 1990, 104 Stat. 523. Prior to general amendment, subsec. (c)(2) related to preparation of a National Contingency Plan. Provisions relating to a National Contingency Plan are contained in section 1321(d) of Title 33, Navigation and Navigable Waters.

Such amendments and the amendments made by the Superfund Amendments and Reauthorization Act of 1986, referred to in subsec. (b), are the amendments made by Pub. L. 99–499, Oct. 17, 1986, 100 Stat. 1613. For complete classification of this Act to the Code, see Short Title of 1986 Amendment note set out under section 9601 of this title and Tables.

AMENDMENTS

2002—Subsec. (h). Pub. L. 107–118 added subsec. (h).
1986—Subsec. (a). Pub. L. 99–499, §105(a)(1), designated existing provisions as subsec. (a) and added heading.
Subsec. (a)(8)(A). Pub. L. 99–499, §105(a)(2), inserted ''the damage to natural resources which may affect the human food chain and which is associated with any release or threatened release, the contamination or potential contamination of the ambient air which is associated with the release or threatened release,'' after ''ecosystems,''.
Subsec. (a)(8)(B). Pub. L. 99–499, §105(a)(3), struck out ''at least four hundred of'' after ''To the extent practicable,'', substituted ''one hundred highest priority facilities'' for ''one hundred highest priority facilities at least'', and inserted ''A State shall be allowed to designate its highest priority facility only once.''
Subsec. (a)(9). Pub. L. 99–499, §105(a)(4), inserted ''and including consideration of minority firms in accordance with subsection (f) of this section''.
Subsec. (a)(10). Pub. L. 99–499, §105(a)(5), added par. (10).
Subsecs. (b) to (g). Pub. L. 99–499, §105(b), added subsecs. (b) to (g).

## § 9606. Abatement actions

**(a) Maintenance, jurisdiction, etc.**

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to,

issuing such orders as may be necessary to protect public health and welfare and the environment.

**(b) Fines; reimbursement**

(1) Any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this section may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues.

(2)(A) Any person who receives and complies with the terms of any order issued under subsection (a) of this section may, within 60 days after completion of the required action, petition the President for reimbursement from the Fund for the reasonable costs of such action, plus interest. Any interest payable under this paragraph shall accrue on the amounts expended from the date of expenditure at the same rate as specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of title 26.

(B) If the President refuses to grant all or part of a petition made under this paragraph, the petitioner may within 30 days of receipt of such refusal file an action against the President in the appropriate United States district court seeking reimbursement from the Fund.

(C) Except as provided in subparagraph (D), to obtain reimbursement, the petitioner shall establish by a preponderance of the evidence that it is not liable for response costs under section 9607(a) of this title and that costs for which it seeks reimbursement are reasonable in light of the action required by the relevant order.

(D) A petitioner who is liable for response costs under section 9607(a) of this title may also recover its reasonable costs of response to the extent that it can demonstrate, on the administrative record, that the President's decision in selecting the response action ordered was arbitrary and capricious or was otherwise not in accordance with law. Reimbursement awarded under this subparagraph shall include all reasonable response costs incurred by the petitioner pursuant to the portions of the order found to be arbitrary and capricious or otherwise not in accordance with law.

(E) Reimbursement awarded by a court under subparagraph (C) or (D) may include appropriate costs, fees, and other expenses in accordance with subsections (a) and (d) of section 2412 of title 28.

**(c) Guidelines for using imminent hazard, enforcement, and emergency response authorities; promulgation by Administrator of EPA, scope, etc.**

Within one hundred and eighty days after December 11, 1980, the Administrator of the Environmental Protection Agency shall, after consultation with the Attorney General, establish and publish guidelines for using the imminent hazard, enforcement, and emergency response authorities of this section and other existing statutes administered by the Administrator of the Environmental Protection Agency to effectuate the responsibilities and powers created by this chapter. Such guidelines shall to the extent practicable be consistent with the national hazardous substance response plan, and shall include, at a minimum, the assignment of responsibility for coordinating response actions with the issuance of administrative orders, enforcement of standards and permits, the gathering of information, and other imminent hazard and emergency powers authorized by (1) sections 1321(c)(2),[1] 1318, 1319, and 1364(a) of title 33, (2) sections 6927, 6928, 6934, and 6973 of this title, (3) sections 300j–4 and 300i of this title, (4) sections 7413, 7414, and 7603 of this title, and (5) section 2606 of title 15.

(Pub. L. 96–510, title I, §106, Dec. 11, 1980, 94 Stat. 2780; Pub. L. 99–499, title I, §§106, 109(b), Oct. 17, 1986, 100 Stat. 1628, 1633; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (c), was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, as amended, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which enacted this chapter, section 6911a of this title, and sections 4611, 4612, 4661, 4662, 4681, and 4682 of Title 26, Internal Revenue Code, amended section 6911 of this title, section 1364 of Title 33, Navigation and Navigable Waters, and section 11901 of Title 49, Transportation, and enacted provisions set out as notes under section 6911 of this title and sections 1 and 4611 of Title 26. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

Section 1321(c)(2) of title 33, referred to in subsec. (c), was amended generally by Pub. L. 101–380, title IV, §4201(a), Aug. 18, 1990, 104 Stat. 523. Prior to general amendment, subsec. (c)(2) related to preparation of a National Contingency Plan. Provisions relating to a National Contingency Plan are contained in section 1321(d) of Title 33, Navigation and Navigable Waters.

AMENDMENTS

1986—Subsec. (b). Pub. L. 99–499 designated existing provisions as par. (1), substituted "who, without sufficient cause, willfully" for "who willfully" and "$25,000" for "$5,000", and added par. (2).

Subsec. (b)(2)(A). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

COORDINATION OF TITLES I TO IV OF PUB. L. 99–499

Any provision of titles I to IV of Pub. L. 99–499, imposing any tax, premium, or fee; establishing any trust fund; or authorizing expenditures from any trust fund, to have no force or effect, see section 531 of Pub. L. 99–499, set out as a note under section 1 of Title 26, Internal Revenue Code.

## § 9607. Liability

**(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

---

[1] See References in Text note below.

essary to prevent or mitigate injury to human health or the environment associated with the release or threatened release of any hazardous substance or pollutant or contaminant. Such measures may include, where appropriate, security fencing to limit access, response to fires and explosions, and other measures which require immediate response at the local level.

**(2) Local funds not supplanted**

Reimbursement under this section shall not supplant local funds normally provided for response.

**(c) Amount**

The amount of any reimbursement to any local authority under subsection (b)(1) of this section may not exceed $25,000 for a single response. The reimbursement under this section with respect to a single facility shall be limited to the units of local government having jurisdiction over the political subdivision in which the facility is located.

**(d) Procedure**

Reimbursements authorized pursuant to this section shall be in accordance with rules promulgated by the Administrator within one year after October 17, 1986.

(Pub. L. 96–510, title I, §123, as added Pub. L. 99–499, title I, §123(a), Oct. 17, 1986, 100 Stat. 1688.)

**§ 9624. Methane recovery**

**(a) In general**

In the case of a facility at which equipment for the recovery or processing (including recirculation of condensate) of methane has been installed, for purposes of this chapter:

(1) The owner or operator of such equipment shall not be considered an "owner or operator", as defined in section 9601(20) of this title, with respect to such facility.

(2) The owner or operator of such equipment shall not be considered to have arranged for disposal or treatment of any hazardous substance at such facility pursuant to section 9607 of this title.

(3) The owner or operator of such equipment shall not be subject to any action under section 9606 of this title with respect to such facility.

**(b) Exceptions**

Subsection (a) of this section does not apply with respect to a release or threatened release of a hazardous substance from a facility described in subsection (a) of this section if either of the following circumstances exist:

(1) The release or threatened release was primarily caused by activities of the owner or operator of the equipment described in subsection (a) of this section.

(2) The owner or operator of such equipment would be covered by paragraph (1), (2), (3), or (4) of subsection (a) of section 9607 of this title with respect to such release or threatened release if he were not the owner or operator of such equipment.

In the case of any release or threatened release referred to in paragraph (1), the owner or operator of the equipment described in subsection (a) of this section shall be liable under this chapter only for costs or damages primarily caused by the activities of such owner or operator.

(Pub. L. 96–510, title I, §124, as added Pub. L. 99–499, title I, §124(a), Oct. 17, 1986, 100 Stat. 1688.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

**§ 9625. Section 6921(b)(3)(A)(i) waste**

**(a) Revision of hazard ranking system**

This section shall apply only to facilities which are not included or proposed for inclusion on the National Priorities List and which contain substantial volumes of waste described in section 6921(b)(3)(A)(i) of this title. As expeditiously as practicable, the President shall revise the hazard ranking system in effect under the National Contingency Plan with respect to such facilities in a manner which assures appropriate consideration of each of the following site-specific characteristics of such facilities:

(1) The quantity, toxicity, and concentrations of hazardous constituents which are present in such waste and a comparison thereof with other wastes.

(2) The extent of, and potential for, release of such hazardous constituents into the environment.

(3) The degree of risk to human health and the environment posed by such constituents.

**(b) Inclusion prohibited**

Until the hazard ranking system is revised as required by this section, the President may not include on the National Priorities List any facility which contains substantial volumes of waste described in section 6921(b)(3)(A)(i) of this title on the basis of an evaluation made principally on the volume of such waste and not on the concentrations of the hazardous constituents of such waste. Nothing in this section shall be construed to affect the President's authority to include any such facility on the National Priorities List based on the presence of other substances at such facility or to exercise any other authority of this chapter with respect to such other substances.

(Pub. L. 96–510, title I, §125, as added Pub. L. 99–499, title I, §125, Oct. 17, 1986, 100 Stat. 1689.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.